UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                      :
WILLIAM L. KOCH,
                                                      :
                                   Plaintiff,                        06 Civ. 6586 (BSJ) (DF)
                                                      :
                  -against-                                          **REPORT AND**
                                                      :              **RECOMMENDATION**
HARDY RODENSTOCK,
d/b/a Meinhard Goerke,                                :

                                   Defendant.    :
-------------------------------------------------------------X

**TO THE HONORABLE BARBARA S. JONES, U.S.D.J.:**

       In this diversity action, plaintiff William L. Koch ("Plaintiff") alleges that he was led to

purchase counterfeit bottles of rare wine, as a result of fraudulent conduct by defendant Hardy

Rodenstock ("Defendant").  (*See* Second Amended Complaint, dated Sept. 23, 2008 ("2d Am.

Compl.") (Dkt. 64), at 1-3.)  Plaintiff is seeking both monetary damages and declaratory relief.

(*Id.*)  Defendant was initially represented by counsel in this case, but from at least the date that

counsel withdrew from representing him, Defendant has essentially refused to participate in any

discovery or case management conferences.

       On April 23, 2010, as a result of Defendant's refusal to participate in these proceedings,

I recommended that a default judgment be entered against him.  (*See* Report and

Recommendation, dated Apr. 23, 2010 (Dkt. 81) ("4/23/10 R&R").)  By Order dated May 18,

2010, the Honorable Barbara S. Jones, U.S.D.J., adopted my recommendation, entered judgment

against Defendant, and referred the matter to me to conduct a damages inquest.  (*See* Order,

dated May 18, 2010 (Dkt. 82) ("5/18/10 Order") (adopting 4/23/10 R&R), at 3.)  In connection

with the inquest, Plaintiff submitted Proposed Findings of Fact and Conclusions of Law, and

then amended those Proposed Findings.  (*See* Dkts. 84, 86, 90.)  Despite the passage of time, Defendant has not responded to Plaintiffs' submissions.

Upon review of Plaintiff's submissions, I recommend that he be granted compensatory and punitive damages in the amounts set forth below, but that his request for declaratory relief be denied.

## BACKGROUND

### A.    Factual Background[1]

Defendant, a German national residing in Germany, has been involved in the tasting and promotion of rare vintages of wine.  (*See* 2d Am. Compl., ¶ 1.)  At some point, Defendant allegedly decided to forge bottles of rare wine, while representing to others that he had discovered them.  (*See id.*)

### 1.    "Thomas Jefferson" Wine

In particular, Defendant forged bottles of wine that he represented were discovered in Paris and likely owned by Thomas Jefferson.  (*Id.*, ¶ 3-4.)  As part of his scheme to defraud purchasers, Defendant ensured that his Thomas Jefferson wine story possessed certain indicia of authenticity.  (*Id.*, ¶ 5.)  The bottles that he forged appeared to be very old, consistent with bottles from the time period in which Jefferson would have lived, and they were engraved with the initials "Th.J."  (*Id.*, ¶ 5.)  Moreover, it was credible that such wine might be discovered in Paris, as Jefferson, who was an avid wine collector, lived in Paris in the late 18th century while serving as the American Minister to France.  (*Id.*, ¶ 5.)  Further, according to historical records,

---

[1] The facts set forth herein are primarily taken from the Second Amended Complaint, the allegations of which are accepted as true as a result of Defendant's default.  (*See* Background Section A, *infra.*)

Jefferson purchased hundreds of bottles of French wine during this tour and after returning to the United States.  (*Id.*, ¶ 5.)  Plaintiff, however, has investigated Defendant's purported discovery of the Thomas Jefferson wine, and has determined that Defendant was, in fact, perpetrating a hoax.  (*Id.*, ¶ 3.)

**a.      Defendant's Representations Regarding
the Purported Thomas Jefferson Wine, and
<u>Plaintiff's Reliance on Those Representations</u>**

In order to sell the fake "Thomas Jefferson wine," Defendant made certain representations to Christie's, an auction house based in London.  (*Id.*, ¶ 18.)  Christie's proceeded to hold an auction, on December 5, 1985, for a bottle of the purported Thomas Jefferson wine, noting in its catalogue that the wine was the property of Defendant (*id.*, ¶ 17), and suggesting, based on Defendant's statements, that the wine had been bottled for, sold to, or owned by Thomas Jefferson (*see id.*, ¶ 16).  Specifically, after consigning the bottle to Christie's for sale, Defendant told the auction house that the bottle, and others like it, had been discovered in a walled-up wine cellar in Paris.  (*Id.*, ¶ 18.)  Christie's catalogue for the auction then noted that "'Th.J. are the initials of Thomas Jefferson[,] one of the most splendid men of American history"; that "Jefferson's purchases of Bordeaux wines are well documented"; and that "[t]he initials 'Th.J.' were engraved on the bottle along with '1787' and 'Lafitte.'"  (*Id.*, ¶ 16 (quoting Christie's catalogue (internal quotation marks omitted)).)  The Christie's catalogue also noted other indicia of authenticity, stating that "Jefferson lived in France from May 1784 to October 1789," and that, "in 1787, Jefferson toured the wine regions of southern France."  (*Id.*, ¶ 17.)  The catalogue further stated that a side of the bottle "ha[d] been cleaned to reveal the original wheel engraved script figures and letters '1787 Lafitte Th.J.'"  (*Id.*, ¶ 17 (quoting Christie's catalogue (internal quotation marks omitted)).)

3

Although Plaintiff apparently did not purchase the bottle of "Thomas Jefferson" wine that Christie's placed in its auction in 1985, Plaintiff nonetheless relied on Christie's statements (which were derived from Defendant's representations), in purchasing a different bottle of Defendant's supposed Thomas Jefferson wine in November 1988, from the Chicago Wine Company.  (*Id.*, ¶ 21.)   It was Plaintiff's understanding that this wine was found at the same walled-up cellar location in Paris as those bottles auctioned by Christie's.  (*Id.*, ¶ 21.)

Then, in December 1988, Plaintiff purchased from Farr Vintners, Ltd. ("Farr Vintners") three more bottles of purported Thomas Jefferson wine:  a 1787 Lafite, a 1784 Lafite, and a 1784 Ch. Branne Mouton.  (*Id.*, ¶ 22.)  Farr Vinters, which is a wine brokering company, acted as Defendant's agent for the sale.  (*Id.*, ¶¶ 22, 25.)  Defendant knew that Plaintiff was purchasing these three bottles (*see id.*, ¶ 24), and was personally involved in the transaction (*see id.*, ¶ 26). In fact, as the parties negotiated the transaction, Defendant sent a letter to Farr Vintners that mentioned Plaintiff by name and suggested a sale price for the bottles.  (*Id.*, ¶ 26; *id.*, Ex.1 (Letter to Stephen Browett of Farr Vintners, from Defendant, dated Jan. 11, 1988 ("1/11/88 Ltr.") (Dkt. 64-2)).)  Through Farr Vintners, Defendant represented that these bottles were discovered in the same cellar in which he found the Thomas Jefferson wine auctioned by Christie's in 1985 (*id.*, ¶ 22; Affidavit of William I. Koch In Support of Findings of Fact and Conclusions of Law in Support of Plaintiff's Claim for Damages Pursuant to Judgment of Default, dated July 14, 2010 ("Koch Aff.") (Dkt. 86-15), ¶ 6).  Given Defendant's misrepresentations, which were first repeated by Christies' and then by Farr Vintners, Plaintiff reasonably believed that these bottles of wine had been owned by or bottled for Thomas Jefferson.  (*See* 2d Am. Compl., ¶ 21.)

### b.   Monticello's Doubts About the Authenticity of the Thomas Jefferson Wine, and Plaintiff's Eventual Discovery of Defendant's Fraud

Thomas Jefferson experts at the Thomas Jefferson Memorial Foundation ("Monticello") did not believe that Defendant's purported Thomas Jefferson wine bottles were genuine.  (*Id.*, ¶ 56.)  In a report entitled "Research Report:  Chateau Lafite 1787, with initials 'Th.J.,'" dated December 15, 1985, which was made public in 2006, Lucia Goodwin, who served as the director of research at Monticello at the time of the report's preparation, questioned the authenticity of Defendant's Thomas Jefferson wine.  (*Id.*, ¶ 35-37; Affidavit of Bruce Wessel In Support of Findings of Fact and Conclusions of Law in Support of Plaintiff's Claim for Damages Pursuant to Judgment of Default, dated July 14, 2010 ("Wessel Aff.") (Dkt. 84-2), ¶ 2 & Ex. 1 (Research Report: Chateau Lafite 1787, with initials "Th. J.," dated Dec. 12, 1985 ("Goodwin Report")).) Goodwin was skeptical for the following reasons:

(1)   Jefferson's highly detailed financial records, including daily receipts and expenditures, did not show a purchase of this wine;

(2)   Most of Jefferson's wine orders appeared in particular records that did not mention Chateau Lafite, the vintner associated with some of the purported Thomas Jefferson bottles;

(3)   With only one exception, none of Jefferson's records showed anything related to the vintages of the bottles that Defendant claimed to have found;

(4)   If the bottles were a gift to Jefferson, then he would have received them before he left Paris, but he left Paris in 1789, too early for the supposed 1787 vintage to have been bottled; and

(5)   None of the Jefferson wine bottles at Monticello were engraved, and there is no historical evidence that Jefferson ever asked for wine bottles to be engraved.

5

(*See* 2d Am. Compl., ¶ 36; *see also* Goodwin Report.)  The Goodwin Report further questioned

the styling of the initials engraved on the bottles, noting that, while "[t]he form 'Th:J,' with a

colon between the two parts, was the shortened form of his signature in correspondence[,] . . . the

'Th.J.' on the bottles [using a period and not a colon] does not quite fit any of the forms used or

specified by Jefferson.'"  (*See* 2d Am. Compl., ¶ 37 (quoting Goodwin Report (internal

quotation marks omitted)).)

　　In an effort to suppress such statements, because they would hinder his ability to sell

counterfeit wine, Defendant responded to the report with private letters to Monticello in 1985

and 1986, disputing its findings, and encouraged others to write similar letters.  (*See* 2d Am.

Compl., ¶ 38.)  As result of Plaintiff's efforts to suppress the truth, Plaintiff did not learn of

Monticello's doubts about the wine until a exhibition of the wine in Boston in March 2005.  (*Id.*,

¶¶ 28, 39.)[2]

---

　　[2] It is not entirely clear from Plaintiff's submission that Plaintiff was unable to learn of
Monticello's doubts about the wine earlier than 2005.  Under New York law, a fraud action must
be commenced "within two years after . . . actual or imputed discovery or within [six years]
computed from the time the cause of action accrued, whichever is longer."  N.Y.C.P.L.R.
§ 203(g); *see also id.* § 213(8).  It is possible that, with reasonable diligence, Plaintiff could have
discovered Monticello's 1985 report before his wine purchases in 1988, more than two decades
before the initiation of the current action.  Indeed, in the context of Plaintiff's separate claims
against Christie's, the Court found that Plaintiff was on inquiry notice of Defendant's potential
fraud no later than October 2000.  *See Koch v. Christie's International PLC*, 785 F. Supp. 2d 105,
115-16 (S.D.N.Y. 2011).  Accordingly, had Defendant not defaulted, he might well have
successfully raised a statute-of-limitations defense.  Nevertheless, as the statute of limitations is
an affirmative defense, and as Defendant has refused to participate in these proceedings, the
Court declines to consider this defense in its calculation of damages against him.  *See Latimore
v. Schilling*, No. 06 Civ. 7639 (BSJ) (AJP), 2008 U.S. Dist. LEXIS 45929, at *6 n.4 (S.D.N.Y.
June 13, 2008) (noting that defaulting defendant may have had a valid statute-of-limitations
defense, but holding that "[b]ecause the statute of limitations is an affirmative defense (and
because there could be circumstances that would have tolled the statute of limitations), the Court
is reluctantly constrained to consider the amount of damages"); *Clement v. United Homes, LLC*,
No. 10-CV-2122 (RRM), 2010 U.S. Dist. LEXIS 125943, at *4-5 (E.D.N.Y. Nov. 30, 2010)
(deeming "the statute of limitations defense abandoned by [defaulting defendant's] failure to

Upon learning of those doubts, Plaintiff initiated an investigation into Defendant's wine activities, especially those related to the supposed Thomas Jefferson wine. (*Id.*, ¶ 39.) By then examining purported Thomas Jefferson wine that had been sold and donated to various third parties (*see id.*, ¶ 40-41), Plaintiff's investigators discovered that the wine bottles were not authentic and that Defendant had attempted to sell other forged wines, including other purportedly rare and antique wines purchased by Plaintiff and others (*id.*, ¶ 39; *see also* Background Section A(2), *infra*). During the course of Plaintiff's investigation, experts examined several bottles of "Thomas Jefferson" wine and concluded that the "Th.J." initials on them were engraved by an electric power tool or other tools that did not exist in the 18th century. (*Id.*, ¶ 29.) Expert examination of Thomas Jefferson wine owned by other parties has also revealed those bottles to be fake. (*See id.*, ¶¶ 40-41 (alleging that experts have concluded that Thomas Jefferson wine owned by Forbes Management Co Inc. and Chateau d'Yquem have forged engravings).)

In the face of Plaintiff's questions regarding the origins of the Thomas Jefferson wine, Defendant continued to repeat his assertions to Plaintiff and others that the wine was authentic. (*See id.*, ¶ 33.) In January, 2006, Plaintiff sent a facsimile message to Defendant, requesting that Defendant "send a brief letter and authenticate the facts that the above bottles of wine, sold through Farr Vintners, with the engraved initials Th J, were acquired by you or your agents from a walled-up cellar near Paris and that you have every reason to believe that the above bottles of

---

appear and assert that defense"); *Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987) ("If a defendant fails to assert the statute of limitations defense, the district court ordinarily should not raise it sua sponte.").

wine once belonged to Thomas Jefferson.'"  (*Id.* ¶ 31 (internal quotation marks omitted); *see also id.*, Ex. 2 (Letter to Defendant, from Plaintiff, dated Jan. 3, 2006 ("1/3/06 Ltr.") (Dkt. 64-3)).)  In a faxed response, Defendant wrote that "for me the Jefferson bottles are absolutely genuine and – as you rightly wrote come from a walled-up cellar in Paris" and that "[o]nly after the experts from Christie's have established that the bottle was absolutely genuine, it has been included in the auction."  (2d Am. Compl., ¶ 32 (internal quotation mark omitted); *see also id.*, Ex. 3 (Letter to Plaintiff, from Defendant, dated Jan. 10, 2006 (Dkt. 64-4).)[3]

Then, in response to an April 2006 letter from Plaintiff requesting a meeting with Defendant to discuss authenticity issues (*see* 2d Am. Compl., Ex. 4 (Letter to Defendant, from Plaintiff, dated Apr. 10, 2006 (Dkt. 64-5)), Defendant altered his story regarding the discovery of the Thomas Jefferson wine and claimed that he "bought these bottles 21 years ago in Paris from people who had offered them to me."  (2d Am. Compl., ¶ 33; *see also id.*, Ex. 5 (Letter to Plaintiff, to Defendant, dated May 11, 2006 ("5/11/06 Ltr.") (Dkt. 64-6).)  Defendant did not identify the sellers of these bottles and stated that he did not know if they were still alive.  (*See* 2d Am. Compl., ¶ 33.)  Defendant did state, though, that Christie's had "the engraving, the glass and so on closely examined" (*id.*, ¶ 33 (quoting 5/11/06 Ltr.)), and that "the [Jefferson] wine was absolutely genuine" (*id.*, ¶ 33 (quoting 1/3/06 Ltr.)).  Such statements by Defendant in 2006 were part of an ongoing scheme to conceal the truth that the Thomas Jefferson bottles were forgeries.  (*Id.*, ¶ 34.)

---

[3]  The Court notes that, although Defendant has repeatedly contended in this Court that his English-language abilities are insufficient to enable him to participate in these proceedings without German translations, his letters to Plaintiff demonstrate what appears to be a reasonable command of English.  (*See, e.g.*, *id.*)

### 2. Other Counterfeit Wine Originating from Defendant and Purchased by Plaintiff

After supposedly witnessing the high prices being paid for 1921 Petrus, which is known as an "exceptional vintage," Defendant also allegedly created counterfeit bottles of such wine and sold them as genuine vintages to unknowing consumers. (*Id.*, ¶ 45.) On October 28, 2005, Plaintiff purchased one such bottle – a magnum bottle of supposed 1921 Petrus – from Zachys Wine Auction ("Zachys") in New York, for $33,150.00. (*Id.*, ¶ 42.) After discovering a possible link between this bottle and Defendant, Plaintiff's investigators brought the bottle to Chateau Petrus in France for inspection by experts in 2006. These experts concluded that no evidence existed that Petrus actually bottled magnums in 1921. (*See id.*, ¶ 36.) They further concluded that, while Plaintiff's Petrus was a very impressive fake, the cork was too long and the metal cap and label appeared to have been artificially aged. (*See id.*, ¶ 43.)

In addition to the fake Thomas Jefferson wine and the 1921 Petrus, Plaintiff claims to have bought other counterfeit wine from Farr Vintners, which had obtained that wine from Defendant. These wines included one bottle of each of the following vintages: 1737 Lafite, 1737 Mouton, 1771 Lafite, 1791 Latour, 1848 Mouton, 1958 Mouton, 1864 Lafite, 1893 Lafite, and 1936 Petrus. When he made these purchases, Plaintiff did not know that this wine was counterfeit, and he did not know that Defendant was the source of this wine. (*See id.*, ¶ 46.)

### B. Procedural History

The Court's April 23, 2010 Report and Recommendation, familiarity with which is assumed, describes the procedural history of this case in detail. (*See* 4/23/10 R&R, Background Section.)

In sum, Plaintiff initiated this action against Defendant on August 31, 2006, asserting claims for common law fraud claim and declaratory relief.  (*See* Complaint, dated Aug. 31, 2006 (Dkt. 1), ¶¶ 39-50; *see also* 2d Am. Compl., ¶¶ 48-59.)  Although Plaintiff was initially represented by counsel, his counsel withdrew on August 14, 2007.  (*See* Dkt. 42.)  Not long after that point, Defendant began to refuse to participate in any discovery or to appear at scheduled conferences.  Instead, for a substantial period of time, Defendant remained entrenched in his position that, unless the Court conducted all proceedings in German, he had no obligation to do anything to defend the action.  Although the Court issued an Order rejecting Defendant's argument (*see* Order, dated Nov. 6, 2009 (Dkt. 76)), Defendant asserted repeatedly that he considered the Court's Order erroneous, "unlawful," and incapable of binding him (*see* 4/23/10 R&R (quoting Letter to the Court, from Defendant, dated Mar. 4, 2010, at 1)).  Defendant also made absolute and unequivocal statements that, unless the Court vacated its Order and handled these proceedings in the manner he specified (which would have included providing a certified German interpreter, at the Court's expense, for all conferences), he would simply refuse to appear or to defend the action.  (*See id.* (citing various letters to the Court, from Petitioner).)  In light of these statements, this Court recommended to Judge Jones, on April 23, 2010, that a default judgment be entered against Defendant pursuant to Rule 37 of the Federal Rules of Civil Procedure ("Rule 37").  (*See generally id.*)  By Order dated May 18, 2010, Judge Jones entered a default judgment against Defendant and referred the matter to me for an inquest on the issue of damages.  (*See* 5/18/10 Order, at 3 (adopting 4/23/10 R&R).)

On June 14, 2010, this Court issued an Order requiring Plaintiff to file and serve on Defendant Proposed Findings of Fact and Conclusions of Law by July 14, 2010.  (*See* Scheduling Order for Damages Inquest, dated June 14, 2010 ("6/14/10 Order") (Dkt. 83), ¶ 2.)

The Court further required Defendant to submit his response, if any, no later than August 13, 2010, and expressly cautioned Defendant that, if he failed to respond or to contact the Court in writing by that date to request an in-court hearing, the Court would issue a report and recommendation concerning damages on the basis of Plaintiff's written submissions alone, without an in-court hearing.  (*See* 6/14/10 Order, ¶ 3.)  On July 14, 2010, Plaintiff filed Proposed Findings of Fact and Conclusions of Law (*see* Dkt. 84) and served a copy on Defendant (*see* Dkt. 85).[4]  On October 29, 2010, Plaintiff then filed Amended Proposed Findings of Fact and Conclusions of Law (Amended Proposed Findings of Fact and Conclusions of Law in Support of Plaintiff's Claim for Damages Pursuant to Judgment of Default, dated Oct. 29, 2010 ("Am. Proposed Findings") (Dkt. 90)), which he also served on Defendant (*see* Dkt. 91).

Despite the substantial passage of time, Defendant has never submitted a response to Plaintiff's submissions, nor has Defendant contacted the Court to request an in-person hearing. Rather, throughout 2010, Defendant continued to submit letters – both to the Court and to Plaintiff – reiterating his refusal to participate in these proceedings.  For instance, Defendant submitted a letter to the Court, dated May 5, 2010, stating that "[D]efendant [was] no longer obliged to take part in the proceedings" because documents had not been translated into German. (Letter to the Court, from Defendant, dated May 5, 2010.)  Along with this letter, Defendant returned to the Court a copy of its April 23, 2010 Report and Recommendation, which the Court had sent to him.  Similarly, Defendant apparently returned Plaintiff's Proposed Findings of Fact and Conclusions of Law to Plaintiff, unopened, along with a letter dated July 21, 2010, written in German, reiterating that he would " no longer receive or accept documents that [were] sent

---

[4] Due to a filing error, Plaintiff resubmitted its Proposed Findings of Fact and Conclusions of Law (Dkt. 86) and its Certificate of Service (Dkt. 87) on July 15, 2010.

directly to [him]" and that he would "consent only to service via a central authority in the German Language."  (Letter to Plaintiff, from Defendant, dated July 21, 2010)[5]

The Court also notes that, quite recently, on April 2, 2012, the Court received a series of anonymous facsimile transmissions, suggesting that Defendant was not responsible for Plaintiff's purchase of counterfeit wine.  As the faxes contain no indication of their sender's identity, the Court will not consider them here.

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

"A default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability," but it does not reach the issue of damages.  *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854 (2d Cir. 1995) (quoting *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973)).  In conducting an inquest, the Court thus accepts as true all of the factual allegations of the Complaint, except those relating to damages.  *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).  As to damages, a plaintiff must substantiate his claims with evidence to prove the extent of damages.  *See Trehan v. Von Tarkanyi*, 63 B.R. 1001, 1008 n.12 (S.D.N.Y. 1986) (plaintiff must introduce evidence to prove damages suffered and the court will then determine whether the relief flows from the facts (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974))).

Without a response from Defendant, this Court must assess whether Plaintiff has provided a sufficient basis for the Court to determine damages.  *See Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (noting that the Court

---

[5]  Plaintiff has provided the Court with a copy of Defendant's June 21st letter, together with a certified English translation.  (*See* Letter to the Court, from Plaintiff, dated Dec. 5, 2011.)

"should take the necessary steps to establish damages with reasonable certainty").  Although the Court may hold a hearing to assess damages pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, a hearing is not required where a sufficient basis on which to make a calculation exists.  *See* Fed. R. Civ. P. 55(b)(2) (court may conduct hearings on damages as necessary); *see also Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) (judges are given much discretion to determine whether an inquest need be held); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991) (stating that Rule 55(b)(2) "allows but does not require . . . a hearing").  In this case, a hearing is unnecessary because the documents supplied by Plaintiff provide a "sufficient basis from which to evaluate the fairness" of Plaintiff's claimed damages.  *Fustok v. ContiCommodity Servs. Inc.*, 873 F.2d 38, 40 (2d Cir. 1989); *see also Marc Rich & Co.*, 951 F.2d at 508.

## II.    PLAINTIFF'S FRAUD CLAIM

### A.    Choice of Law

In his submissions, Plaintiff has relied on New York law to support his claimed fraud damages (*see generally* Am. Proposed Findings), and this Court agrees that New York law should apply.

The Court has diversity jurisdiction over Plaintiff's common-law fraud claim and, accordingly, must apply the choice-of-law rules of New York, the forum state.  *See Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d Cir. 2003).  In New York, "a cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence."  *Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973); *see also Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 292 (S.D.N.Y.2000) (stating that "fraud claims are governed by the state in which

the injury is deemed to have occurred, which is usually where the plaintiff is located" (citations and internal quotation marks omitted)); *San Diego County Employees Retirement Ass'n v. Maounis*, 749 F. Supp. 2d 104, 124 (S.D.N.Y. 2010) (stating that "[f]or claims based on fraud, the locus of the fraud is 'the place where the injury was inflicted, as opposed to the place where the fraudulent act originated,' which 'is usually where the plaintiff is located" (internal citation and quotation marks omitted)).

In this case, the Second Amended Complaint indicates that, although Plaintiff is a resident of Florida (*see* 2d Am. Compl., ¶ 12), he also maintains a residence in New York (*see id.*, ¶ 31).  Moreover, as alleged in the pleading, various aspects of the alleged fraud appear to have been connected to New York in a manner suggesting that "the injury was inflicted" here. Specifically, Plaintiff alleges that he met Defendant in New York (*see id.*, ¶ 2); that, in purchasing three bottle of Thomas Jefferson wine from Farr Vinters, Plaintiff relied on Christie's catalogue for a New York auction of Defendant's wine (*see id.*, ¶ 19); that Farr Vinters personally delivered the three bottles to Plaintiff in New York (*see id.*, ¶ 22); that, in January 2006, Plaintiff sent a fax from his New York home requesting that Defendant confirm the discovery and origins of the Thomas Jefferson wine (*see id.*, ¶ 31); and that Defendant responded to the January 2006 request by sending a fax confirming the authenticity of the wine to Plaintiff's New York home (*see id.*, ¶ 32).  When the law is one that regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384-85 (2d Cir. 2006) (citation and internal quotation marks omitted).   Although not all of Defendant's alleged conduct occurred in New York, enough occurred here to warrant this Court's application of New York law to Plaintiff's claims.

14

**B.**   **Adequacy of Plaintiff's Pleading of Fraud**

Without a response from Defendant, this Court must first determine whether the allegations in the Amended Complaint are sufficiently pleaded to establish Defendant's liability. *See Bambu Sales, Inc.*, 58 F.3d at 854 (stating that "[a] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability" (citation and internal quotation marks omitted)); *see also PSG Poker, LLC v. DeRosa-Grund*, No. 06 Civ. 1104 (DLC) (JCF), 2008 U.S. Dist. LEXIS 59214, at *7 (S.D.N.Y. July 14, 2008) (report and recommendation) ("Where an inquest is conducted following a default judgment, it is generally necessary for the Court to determine whether the allegations of the complaint, taken as true, are sufficient to establish the defendant's liability."), *adopted by* 2008 U.S. Dist. LEXIS 62379 (S.D.N.Y. Aug. 15, 2008).

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001). In addition, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff who alleges fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Although, under Rule 9(b), "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be

15

averred generally," Fed. R. Civ. P. 9(b), Plaintiff must also "allege facts that give rise to a strong inference of fraudulent intent."  *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

For the reasons discussed below, Plaintiff has adequately alleged common-law fraud based on certain purchases of wine, but not based on other purchases.

### 1.      The Purported Thomas Jefferson Wine

In general, the Second Amended Complaint alleges that Defendant "made material misrepresentations to, or concealed or suppressed material facts from, Plaintiff, third parties, and a class of individual wine purchasers of which Plaintiff is a member" (*see* 2d Am. Compl., ¶ 49); that "[t]he omissions or representations by [Defendant] were material and were false and misleading, and [Defendant] knew they were material and were false and misleading at the time they were made" (*id.*, ¶ 50); that, "[a]t the time Plaintiff acted, Plaintiff was unaware of the concealed or suppressed facts and would have acted differently if Plaintiff had known the true facts" (*id.*, ¶ 53); that Defendant "misrepresented, concealed, or suppressed these facts with the intent to influence the actions of Plaintiff, or the actions of the class of individuals of which Plaintiff is a member, including intending to influence purchases of the old wine sold by Rodenstock" (*see id.*, ¶ 51); and that Plaintiff reasonably relied on Defendant's misrepresentations (*see id.*, ¶ 52), and as a result has suffered damages (*see id.*, ¶ 54).

With greater specificity, Plaintiff alleges that, as part of a scheme to defraud, Defendant altered bottles of wine as to provide them with false indicators that they were created, purchased, or owned by Thomas Jefferson.  Further, according to the Second Amended Complaint, in consigning the bottles of wine to Christie's for a 1985 auction in New York, Defendant made specific misrepresentations regarding the discovery and authenticity of the wine, and the auction

16

house subsequently repeated these statements in its catalogue.  (*See id.*, ¶ 18.)  Relying on these misrepresentations, Plaintiff purchased a bottle of Defendant's Thomas Jefferson wine through the Chicago Wine Company in November 1988.  (*Id.*, ¶ 21.)

Defendant also allegedly repeated these particular false statements to his broker, Farr Vinters, to which he consigned additional bottles of the purported Thomas Jefferson wine for sale (*see id.*, ¶¶ 22, 25); at one point, for example, Defendant allegedly stated to the broker that the bottles were "world rarities" (1/11/88 Ltr.).  Relying on such misrepresentations, which were repeated by Farr Vinters, Plaintiff purchased, in December 1988, three more bottles of Thomas Jefferson wine thought to be a 1787 Lafite, a 1784 Lafite, and a 1784 Ch. Branne Mouton.  (*See* 2d Am. Compl., ¶ 22.)  Having allegedly arranged for the counterfeiting of the bottles himself, Defendant would have known that his statements to both Christie's and Farr Vinters regarding the Thomas Jefferson wine were false, and he allegedly made those statements to induce Plaintiff, along with other consumers, into unknowingly purchasing counterfeit wine.

Through such allegations, Plaintiff has sufficiently pleaded the elements of New York common-law fraud, with the particularity required by Rule 9(b), with respect to the so-called "Thomas Jefferson wine."

### 2.   Other Bottles of Wine

Plaintiff, however, has failed to allege facts sufficient to state a fraud claim based on the purchase of the remaining six bottles of wines that allegedly originated from Defendant:  a 1921 Petrus Magnum, a 1737 Lafite, a 1737 Mouton, a 1771 Lafite, a 1791 Latour, 4a 1848 Mouton, a 1958 Mouton, a 1864 Lafite, 1893 Lafite, and a 1936 Petrus.  (*See id.* ¶¶ 42-46.)

With respect to these bottles, the Second Amended Complaint fails to specify the misrepresentations that Defendant made, and also lacks allegations demonstrating that Plaintiff

17

reasonably relied on such statements.  (*See generally id.*; Fed. R. Civ. P. 9(b); *Wynn*, 273 F.3d at

156.)  I therefore recommend that the Court decline to award damages based on these purchases.

*See Lanzafame v. Dana Restoration, Inc.*, No. 09–CV–0873 (ENV) (JO), 2011 U.S. Dist. LEXIS

29341, at *5 (E.D.N.Y. Mar. 22, 2011) (stating that "awarding damages in the face of

insufficient allegations, even after default judgment is entered, would be inconsistent with the

threshold requirement that a complaint be well-pleaded" and adopting report and

recommendation that recovery be denied due to insufficiency of pleadings).

### C.   Fraud Damages

Plaintiff seeks both compensatory and punitive damages for Defendant's sale of the

counterfeit Thomas Jefferson wine.   Both are appropriate in this instance.

#### 1.   Compensatory Damages

Plaintiff contends that he paid $311.804.40 for the four bottles of "Thomas Jefferson

wine" at issue, a figure that, he contends, includes not only the sale prices of the bottles, but also

other costs he incurred, such as transportation and storage costs.  (*See* Am. Proposed Findings,

at 14.)  As for the sale prices of the wine, Plaintiff has submitted invoices detailing the purchase

dates and prices for the four bottles of Thomas Jefferson wine.  According to an invoice dated

November 17, 1988 (the "Chicago Invoice"), Plaintiff paid $100,000 for his first bottle, a 1987

Chateau Branne Mouton, from the Chicago Wine Company.  (*See* Koch Aff., Ex. A (Chicago

Invoice) (Dkt. 84-16).)  According to an invoice dated December 16, 1988 (the "Farr Vintners

Invoice"), Plaintiff paid £116,000 to Farr Vintners for three additional bottles (£40,000 for a

1784 Branne-Mouton, and a combined price of £76,000 for a 1784 Lafitte and a 1787 Lafitte).

(*See* Koch Aff., Ex. B (Farr Vintners Invoice) (Dkt. 84-16).)  At the dollar-pound exchange rate

on December 16, 1988, the date of this invoice, Plaintiff paid the approximate equivalent of

18

$211,486.90 to Farr Vinters in this transaction.[6]  The submitted invoices are thus sufficient to show that Plaintiff paid a total sum of approximately $311,486.90 for the four bottles of Thomas Jefferson wine, and Plaintiff is entitled to recover this amount in compensatory damages.  *See Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993) (holding that New York law provides for "out-of-pocket expenses in fraud cases" (internal citations and quotation marks omitted)), *cert. denied*, 510 U.S. 1112 (1994).

Aside from making a general statement in an affidavit, however (*see* Koch Aff., ¶¶ 14-19), Plaintiff has failed to support the other costs that he claims to have incurred in connection with his purchase of these bottles.  He has provided no documentation to demonstrate any transportation costs, for example, or storage costs or taxes.  In the absence of any documentary evidence to support this aspect of Plaintiff's damages claim, compensation for these other costs should not be awarded.  *See Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 583 (S.D.N.Y. 2010) (holding that certain claimed expenses could not be considered in compensatory damages calculation without documentary support); *P v. Mutual of Omaha Ins.*, 562 N.Y.S.2d 883 (3d Dep't 1990) (holding that "[i]t is well settled that the burden of proving damages in contract actions is on the plaintiff" and that plaintiff was only entitled to damages that were actually admitted by defendant, where plaintiff offered no evidence of other damages).

Plaintiff should, however, be awarded pre-judgment interest on his compensatory damages award, based on New York law, which allows for such interest at the rate of nine percent per annum.  *See* N.Y.C.P.L.R. §§ 5001(a), 5004; *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993); *Panix Prods., Ltd. v. Lewis*, No. 01 Civ. 2709

---

[6]  On December 16, 1988, the exchange rate for £1.00 was approximately $1.823162918. (*See* http://www.taxfreegold.co.uk/1988forexrates.html)

HB, 2003 U.S. Dist. LEXIS 11952, at *6-7 (S.D.N.Y. July 15, 2003) ("Prejudgment interest on the awards for breach of fiduciary duty and fraud is governed by New York C.P.L.R. § 5001."); *Strobl v. New York Mercantile Exch.*, 590 F. Supp. 875, 881 (S.D.N.Y. 1984) (holding that plaintiff was entitled to mandatory recovery of prejudgment interest after favorable verdict on New York common law fraud claim).  Pursuant to the New York Civil Practice Law and Rules, interest on compensatory damages must be calculated from the date the injury incur occurred, *see* N.Y.C.P.L.R. § 5001(b) (providing that interest be computed "from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred"); *Hyosung America, Inc. v. Sumagh Textile Co.*, 137 F.3d 75, 81 (2d Cir. 1998) (holding that, pursuant to Section 5001(b), "[i]nterest is calculated from the date damages were incurred"), and will continue to accrue until a final determination of damages, *see* N.Y.C.P.L.R §§ 5002, 5003.

The Court notes that Plaintiff's submissions do not provide an exact date for when Plaintiff incurred his injuries (*e.g.*, when Plaintiff paid for the bottles of counterfeit wine, or when Defendant delivered the counterfeit wine).  While the Chicago Wine Company and Farr Vintners invoices are both dated, neither specifies a due date for payment from Plaintiff nor indicates when the bottles in question were to be delivered.  (*See* Chicago Invoice; Farr Vintners Invoice (noting "[p]ayment due on receipt of the invoice," but not indicating when the invoice was received).)  Yet, in the absence of more exact dates for when Plaintiff incurred his injuries, this Court, employing its broad discretion, deems the dates of the invoices as acceptable approximations.  *See Panix*, 2003 U.S. Dist. LEXIS 11952, at *8 ("In determining the date from which to calculate the interest when damages were incurred at various times, courts have wide discretion in choosing a reasonable date."); *New Shows, S.A. de C.V. v. Don King Prods., Inc.*,

No. 95 Civ. 8851 (RPP), 1999 U.S. Dist. LEXIS 11522, at *34-35 (S.D.N.Y. July 29, 1999)

(setting the date for interest on fraud damages as "the date of the event which was the subject of

[agreement at issue]"), *rev'd in part on other grounds*, 50 Fed. App'x 49 (2d Cir. 2002).[7]

Accordingly, this Court concludes that Plaintiff is entitled to compensatory damages in

the amount of $311,486.90, plus pre-judgment interest, to be calculated as follows:

> (1)     Compensatory damages of $100,000, for the amount spent
> by Plaintiff on the bottle of counterfeit Thomas Jefferson
> wine purchased from the Chicago Wine Company, with
> interest on this amount at the rate of nine percent per
> annum, from November 17, 1988 (*see* Chicago Invoice) to
> the date of judgment; and

> (2)     Compensatory damages of $211,486.90, for the total
> amount spent by Plaintiff on three bottles of counterfeit
> bottles of Thomas Jefferson wine purchased from Farr
> Vinters, with interest on this sum at the rate of nine percent
> per annum, from December 16, 1988 (*see* Farr Vintners
> Invoice) to the date of judgment.

## 2.     **Punitive Damages**

"[I]n order to state a claim for punitive damages, a claimant must allege conduct which

(1) is aimed at the public generally, (2) involves a fraud evincing a high degree of moral

turpitude and (3) demonstrates such wanton dishonesty as to imply a criminal indifference to

civil obligations."  *Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001) (citation

---

[7] Although some courts have held, in fraud cases, that pre-judgment interest may be
calculated from the date of the defendant's fraudulent misrepresentation, *see Andersen v.
Weinroth*, No. 602339/03, 2006 N.Y. Misc. LEXIS 2333, *93 (Sup. Ct. N.Y. County Sept. 5,
2006) (holding that "when [Defendant] made his fraudulent misrepresentation[] was the earliest
ascertainable date when Plaintiffs cause of action for fraud existed" for purposes of Section
5001(b)), Plaintiff's submissions offer this Court no basis to determine, with any specificity, the
date(s) of Defendants' misrepresentations.  In any event, it would not appear that Plaintiff
incurred any injury in this case until he acted upon Defendant's statements and actually
purchased the counterfeit wine.

and internal quotation marks omitted); *see also Orzzoli v. Syvertsen*, 159 F.3d 1347, 1998 WL 538101, at *5 (2d Cir. 1998) ("Under New York law, punitive damages are recoverable in a fraud action only when the defendant's egregious conduct associated with the breach of contract is part of a pattern directed at the public in general.").[8]

In this case, Defendant's alleged actions satisfy all three requirements for punitive damages. As discussed above (*see* Background Section A(1), *supra*), Plaintiff has alleged that Defendant made concerted efforts to forge indicia of authenticity with respect to the purported Thomas Jefferson wine, which he then offered for sale to the public. He also allegedly made knowingly false statements about the wine to auction houses and brokers, with the intent that the statements be disseminated to the public. Defendant's conduct was thus aimed at the public generally. *See, e.g.*, *Aldrich v. Thomson McKinnon Sec., Inc.*, 756 F.2d 243, 249 (2d Cir. 1985) (affirming award of punitive damages where defendant's conduct "was not only a wrong against [the plaintiff] but, by what it portended for other unfortunate investors, it was a wrong against the general public"). By deliberately perpetrating a hoax regarding the supposed Thomas Jefferson wine, Defendant can also be said to have exhibited the "high degree of moral turpitude" and "wanton dishonesty" necessary to support an award of punitive damages. *See Barrett v. U.S. Banknote Corp.*, 806 F. Supp. 1094, 1101 (S.D.N.Y. 1992) (finding that

---

[8] *But see Jones v. Dana*, No. 06 Civ. 159 (RPP), 2006 U.S. Dist. LEXIS 25293, at *73 (S.D.N.Y. May 2, 2006) (concluding that punitive damages were allowable when a "very high threshold of moral culpability is satisfied" without any need to show "that the fraud was aimed at the public generally"); *Langenberg v. Sofair*, 2006 U.S. Dist. LEXIS 88157, at *4 (S.D.N.Y. Dec. 7, 2006) (report and recommendation) (recommending that plaintiff be allowed to "recover punitive damages without establishing a public wrong" on a fraudulent inducement claim because no contractual relationship existed before the inducement and "the showing of a public wrong . . . need not be shown when a tort claim does not 'arise from' a contractual relationship") (action terminated before ruling on report and recommendation).

"[b]ecause the proposed amended complaint alleges that Christie's fraud was either willfully or recklessly committed, Plaintiff's motion to add a punitive damages claim to the complaint is granted"); *see also Niles v. Palmer*, No. 97 Civ. 7573 (JSM) (KNF), 1999 U.S. Dist. LEXIS 17759, at *47-48 (S.D.N.Y. Oct. 22, 1999) (report and recommendation) (recommending award of punitive damages, where defendants "deliberately and systematically defrauded plaintiffs for profit"), *adopted by* 1999 U.S. Dist. LEXIS 17673 (S.D.N.Y. Nov. 17, 1999); *Walker v. Sheldon*, 10 N.Y.2d 401, 406 (1961) (stating that "those who deliberately and cooly engage in a far-flung scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff").

Although Plaintiff seeks an award of punitive damages in an amount that would be double his compensatory damages, this Court has reviewed relevant precedent, and concludes that an award equal to Plaintiff's compensatory damages – *i.e.*, $311,486.90 – would be more appropriate in this case. Whereas some New York decisions (or federal decisions applying New York law) have awarded punitive damages as a multiple of actual damages, such cases have tended to involved fairly modest actual damages awards – generally not in the six- or seven-figure range.[9] Where higher compensatory damages have been awarded, the courts have more

---

[9] *See, e.g.*, *Wilson v. Car Land Diagnostics Center, Inc.*, No. 99 Civ. 9570 (GEL), 2001 U.S. Dist. LEXIS 19760, at *11-12 (S.D.N.Y. Nov. 15, 2001) (upholding jury verdict of $2,000 in actual damages on fraud and other claims (prior to trebling under relevant statute), and awarding $4,000 in punitive damages); *Johnson v. Home Savers Consulting Corp.,* No. 04-CV-5427 (NG) (KAM), 2007 U.S. Dist. LEXIS 24288, at *28 (report and recommendation) (recommending award of $2,500 in compensatory damages and $7,500 in punitive damages on claims for conversion and civil conspiracy to commit fraud claims), *adopted by* 2007 U.S. Dist. LEXIS 26879 (E.D.N.Y. Apr. 11, 2007); *Handy v. Cohen,* 797 N.Y.S.2d 242, 245-26 (2d Dep't 2005) (determining that punitive damages award of $75,000 would be appropriate, where jury had awarded actual damages of $7,200 on fraud and conversion claims); *cf. Agamede Ltd. v. Life Energy & Technology Holdings, Inc.*, No. 04-CV-2985 (SMG), 2007 U.S. Dist. LEXIS 4698, at *16-23 (E.D.N.Y. Jan. 23, 2007) (for each of several defendants, awarding punitive damages on

typically set punitive damages awards at lesser amounts.[10]  Here, where the amount of actual

damages is already significant, an equal amount in punitive damages should be sufficient to

accomplish the dual purposes of punishment and deterrence.  *See, e.g.*, *Corbin v. Wilson*,

No. 10-CV-3156 (NGG) (RER), 2011 U.S. Dist. LEXIS 111572, at *17 (E.D.N.Y. Aug. 26,

2011) (report and recommendation) (recommending compensatory damages of $174,000 on

fraud claim, and equal amount as punitive damages), *adopted by* 2011 U.S. Dist. LEXIS 105522

(E.D.N.Y. Sept. 16, 2011).

        Plaintiff is not entitled to pre-judgment interest on an award of punitive damages, *see*

*Bd. of Governors of Fed. Reserve Sys. v. Pharaon*, 169 F.3d 110, 115-16 (2d Cir. 1999) ("In

general, courts have been concerned that prejudgment interest not be awarded . . . where punitive

damages are at issue, lest a double penalty be inflicted or the maximum penalty be exceeded"),

and I recommend that none be awarded.

_____

conversion claim in the amount of double compensatory damages, where compensatory damages ranged from $2,683.58 to $136,841.33 for individual defendants, but was $600,000 for corporate defendant)..

        [10] *See, e.g.*, *Miller v. Levin*, No. 02 Civ. 0353 (KMW) (KNF), 2002 U.S. Dist. LEXIS 21108, at *20 (S.D.N.Y. Oct. 30, 2002) (report and recommendation) (where actual damages of $320,000 had been awarded on fraud and other claims, recommending award of punitive damages in amount of $150,000), *adopted by* unpublished Order dated Oct. 31, 2002; *Aetna Life Insur. Co. v. Licht*, No. 03 Civ. 6764 (PKL) (JCF), 2005 U.S. Dist LEXIS 12950, *13-14 (S.D.N.Y. June 14, 2005) (report and recommendation) (recommending actual damages of $911,752.96 against one defendant and $1,306,356.95 against another, on fraud claims, with $500,000 in punitive damages to be awarded jointly and severally), *adopted by* 2005 U.S. Dist. LEXIS 12950 (S.D.N.Y., June 14, 2005) (further granting motion to add prejudgment interest to the damages award); *Langenberg*, 2006 U.S. Dist. LEXIS 88157, at *27 (where defendant was alleged to have defrauded investors out of $4.7 million in cash and securities, recommending award of $1 million in punitive damages); *Niles*, 1999 U.S. Dist. LEXIS 17759, at *53-54 (recommending treble RICO awards ranging from $544,119 to $870,000, with accompanying punitive damages awards of $100,000).

III.    **DECLARATORY RELIEF**

Plaintiff also seeks a declaratory judgment, under New York law, that Defendant's "wine is not authentic and that [Defendant] created the wine to make the bottles appear authentic in order to defraud Plaintiff and others like him."  (2d Am. Compl., ¶ 59; *see also* Am. Proposed Findings, at 19 (seeking a declaration that "the bottles Plaintiff purchased from Defendants, including the [Thomas Jefferson] bottles as described in the Second Amended Complaint, are not authentic").)[11]  Thus, Plaintiff essentially seeks a judicial declaration that the principal factual allegations supporting his fraud claim are true.  The requested declaratory relief should be denied, as Plaintiff misconstrues the purpose of a declaratory judgment action and improperly seeks declaratory relief based on allegations that are entirely duplicative of his fraud claim.

Under New York law,"[a] declaratory judgment should not be rendered unless it will serve some useful purpose to the parties."  *Walsh v. Andorn*, 33 N.Y.2d 503, 507 (1974) (citations omitted).  "The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations."  *Id*. (quoting *James v. Alderton Dock Yards*, 256 N.Y. 298, 305 (1931) (internal quotation marks omitted)).  "Where there is no necessity for resorting to the declaratory judgment[,] it should not be employed."  *Id*. (quoting *James*, 256 N.Y. at 305 (internal quotation marks omitted)).  Indeed, New York courts have held that the court's discretion in awarding declaratory relief should be "exercised judicially and with care," *James*, 256 N.Y. at 305

---

[11] Plaintiff does not invoke the federal Declaratory Judgment Act, 28 U.S.C. § 2201, in either his Second Amended Complaint or his Proposed Findings.  Rather, Plaintiff apparently rests his demand for declaratory relief entirely on state law.  (*See* Am. Proposed Findings, at 18 (stating that "[d]eclaratory relief is an appropriate remedy under New York law in a case where a default judgment has been entered").)

(citation omitted), and that such relief "is usually unnecessary where a full and adequate remedy is already provided by another well-known form of action," *id.*; *see also, e.g.*, *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281 (1st Dep't 1988) (noting that "[a] cause of action for a declaratory judgment is unnecessary and inappropriate where the plaintiff has an adequate, alternative remedy in another form of action" (citations omitted)).

Here, Plaintiff does not seek to "quiet[] or stabiliz[e] an uncertain or disputed jural relation" with Defendant. Indeed, nothing about Plaintiff's claim for declaratory relief seeks, in any way, to clarify the legal rights or obligations of the parties. Rather, as noted above, Plaintiff is merely asking the Court to "declare" the substance of his fraud allegation that Defendant knowingly sold counterfeit wine. It is thus apparent that Plaintiff's declaratory judgment claim is duplicative of his fraud claim – a claim as to which this Court has already recommended that Plaintiff be awarded damages. As declaratory relief is neither necessary nor appropriate in these circumstances, such relief should be denied. *See, e.g.*, *Lichtenstein v. Canna Real Estate Holdings, LLC*, Index No. 601753/06, 2009 N.Y. Misc. LEXIS 5498, at *7-8 (Sup. Ct. N.Y. County Apr. 7, 2009) (dismissing claim for declaratory relief as duplicative of fraud claim); *DC Media Capital LLC v. Sivan*, Index No. 600378/07, 2009 N.Y. Misc. LEXIS 4740, at *13-14 (Sup. Ct. N.Y. County Mar. 9, 2009) (dismissing cause of action for declaratory judgment as "unnecessary and duplicative" of plaintiff's fraud claim, where plaintiff had sought a declaration that defendant had engaged in "fraud," "bad faith" and "deception").[12]

---

[12] For essentially the same reasons, Plaintiff would also not be entitled to declaratory relief under federal law, even had he sought such a remedy. Under the Declaratory Judgment Act, federal courts may "declare the rights and other legal obligations" of parties, as to whom there exists a "case of actual controversy." 28 U.S.C. § 2201(a). In determining whether to declare the rights of litigants, "[t]he court must consider whether a declaratory judgment will [i] serve a useful purpose in clarifying and settling the legal relations in issue; or [ii] afford relief

## CONCLUSION

For the reasons foregoing reasons, I recommend that Plaintiff be awarded judgment against Defendant as follows:

(1)     $100,000 in compensatory damages, with pre-judgment interest, at the rate of nine percent per annum, from November 17, 1988 to the date of judgment;

(2)     $211,486.90 in compensatory damages, with pre-judgment interest, at the rate of nine percent per annum, from December 16, 1988 to the date of judgment; and

(3)     $311,486.90 in punitive damages.

I further recommend that Plaintiff's request for a declaratory judgment be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Barbara S. Jones, United States Courthouse, 500 Pearl Street, Room 1010, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1920, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Jones.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL

---

from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Dolphin Direct Equity Partners, LP v. Interactive Motorsports and Entertainment Corp.*, No. 08 Civ. 1558 (RMB) (THK), 2009 U.S. Dist. LEXIS 21938, at *35 (S.D.N.Y. Feb. 27, 2009) (citation and internal quotation marks omitted).  Neither of these objectives is served where the court has already analyzed the parties' rights in connection with a separate substantive claim; in such a circumstance, "a declaratory judgment on the same issue[s] would be superfluous."  *Id*. at *35-36 (internal quotation marks and citation omitted).

PRECLUDE APPELLATE REVIEW.   *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988)*; McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983).  If Plaintiff does not have access to cases cited herein that are electronically reported, he may request copies from Defendant's counsel.  *See* Local Civ. R. 7.2.

Dated: New York, New York
      May 9, 2012

                                   Respectfully Submitted,

                                   DEBRA FREEMAN
                                   United States Magistrate Judge

Copies to:

Hon. Barbara S. Jones, U.S.D.J.

Mr. Hardy Rodenstock,
a.k.a. Meinhard Goerke
Graudenzer Str. 3
81927 Muenchen
Germany/Deutschland

Shawn Patrick Regan, Esq.
Hunton & Williams, LLP
200 Park Avenue, 52nd Floor
New York, NY 10166

Bruce A. Wessel, Esq.
Irell & Manella, LLP
1800 Avenue fo the Stars, Suite 900
Los Angeles, CA  90067

Melissa Rush McCormick, Esq.
Layn R. Phillips, Esq.
Irell & Manella, LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660